**Opinion filed February 10, 2015**



In The

# Eleventh Court of Appeals

_____

## No. 11-14-00214-CV

_____

## IN THE INTEREST OF R.R.V., II., A CHILD

**On Appeal from the 161st District Court**

**Ector County, Texas**

**Trial Court Cause No. B-3276-PC**

### MEMORANDUM OPINION

The associate judge entered an order terminating the parental rights of the mother and father of R.R.V., II. After a trial de novo held at the mother's request, the district judge entered an order of termination. The mother appeals. In six issues on appeal, she challenges the legal and factual sufficiency of the evidence to support the trial court's findings with respect to termination and the appointment of the managing conservator. We affirm.

*Findings and Issues*

The trial court found that the mother had placed or allowed the child to remain in conditions or surroundings that endangered the child's physical or

emotional well-being; that the mother had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being; and that the mother had failed to comply with the necessary provisions of a court order that specifically established the actions necessary for her to obtain the return of the child, who had been in the managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parents for abuse or neglect. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) (West 2014). The trial court also found that termination was appropriate based upon the mother's mental or emotional illness or mental deficiency. *See id.* § 161.003. Additionally, the trial court found that termination of the mother's parental rights would be in the best interest of the child. *See id.* §§ 161.001(2), 161.003(a)(5).

In her first, second, and third issues, the mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings under Section 161.001(D), (E), and (O), respectively. In her fourth issue, the mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding under Section 161.003. In the fifth issue, the mother challenges the legal and factual sufficiency of the evidence with respect to the trial court's finding that termination of the mother's rights would be in the best interest of the child. In her final issue, the mother argues that the evidence was legally and factually insufficient to support the appointment of the Department as the child's permanent managing conservator.

*Termination Standards of Review*

The termination of parental rights must be supported by clear and convincing evidence. FAM. § 161.001. To terminate parental rights under Section 161.001, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(1)(A)–(T) and that

2

termination is in the best interest of the child. *Id.* Parental rights may also be terminated based upon a parent's mental or emotional illness or mental deficiency that prevents the parent from providing for the physical, emotional, and mental needs of the child. *Id.* § 161.003.

To determine on appeal if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002).

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

*Background Facts*

R.R.V., II was born in March 2013 and was removed from his parents' care two days later. The Department removed the child due to the mother's erratic behavior at the hospital and the unsanitary and unsafe conditions of the parents' home at that time. The mother suffers from bipolar disorder and had stopped taking her medication while pregnant.

A labor and delivery nurse, Kristin Brame, testified that the mother's behavior at the hospital was erratic and extreme. In a matter of seconds, the mother would go from being nice and sweet to really upset, cussing, hitting, and screaming. The mother hit Brame and swatted at another hospital employee. The situation required the presence of security. Brame described the mother's behavior as unusual. Brame said that the mother's conduct was "really dangerous" for the child. The mother ignored instructions to stay in bed even after being informed that it would endanger her baby if she got out of bed. The mother tried to pull out monitors, one of which was attached to the child's head. She also kept picking up one of the monitors and attempting to get out of bed. According to Brame, the mother made statements like, "Why isn't that F'ing B-word not giving me an epidural? She has a vendetta against me. What did I do? I hope she rots in hell." The mother also said that she would blow up the hospital.

The Department received an intake, and an investigation began on the day the child was born. Deric Valdez, an investigative supervisor for the Department, testified that he went to the parents' residence and observed that garbage and large, inappropriate items were strewn outside the residence. Valdez testified that the inside of the home was unsanitary. Human feces and urine filled up the toilets. Windows were broken, and random items were piled throughout the house. At times during this case, the parents' home had no electricity or running water.

The evidence was undisputed that the mother suffered from bipolar disorder and was "mentally ill." Her mental health history showed that she had been hospitalized several times and that she sometimes discontinued her medication because she did not like the side effects. The doctor who conducted the mother's psychiatric evaluation in May 2013 described her as being highly distractible and very intelligent and having heartfelt feelings of love for the child, which was her first child. The mother threatened to kill herself if her parental rights were terminated.

The evidence also showed a disturbing pattern of domestic violence between the mother and the father. Officer Keith Almonte of the Odessa Police Department testified that he had arrested the mother and the father—twice each—for family violence and that there were seventeen incident reports from 2012 to 2014 involving the parents. Officer Almonte testified about an incident that occurred on September 4, 2012. On that occasion, the mother had a laceration to the right side of her head, a swollen black eye, a busted lip, a bloody nose, a large bruise beneath her jaw, and a large bruise near her thigh.

On May 17, 2013, Officer Almonte was dispatched to the parents' residence four times in response to calls made by the father. The first three times, the mother had fled by the time the police arrived. The fourth time Officer Almonte was dispatched, both parents were present when he arrived, and both were arrested. Officer Almonte testified that the mother had two black eyes, a laceration to her right eye, a laceration below her left eye, a bruised right collarbone, small lacerations to both legs, and a scratch across her stomach. The father had scratch marks on his chest, back, and arms—some of which were deep scratch marks.

On September 1, 2013, the mother had a bloody nose, probably a busted lip, and bruising on her throat area. Officer Almonte said that blood was running down all over the mother's shirt. He testified that the mother was "usually smiling about

5

it" after she had been beaten by the father. The mother suggested that they were just playing. The mother became belligerent and irate when she was handcuffed. Officer Almonte also testified about the poor condition of the house, which included foul odor at times, a front door that had been knocked down and was held up by a couch, broken glass on the floor, and stuff everywhere. Another incident occurred in October 2013, for which the mother was arrested.

At the time of the original termination hearing and the trial de novo, the mother had a pending charge for assault family violence. At the time of the trial de novo, the mother was incarcerated for contempt of court; however, she did not testify at the trial de novo, and the record does not reveal the circumstances surrounding that incarceration. The father, who also suffered from bipolar disorder, had been convicted of family violence and had been in jail eight out of twelve months prior to the March 2014 hearing before the associate judge. The record indicates that there were concerns of drug and alcohol use by the parents.

Testimony regarding the mother's supervised visits with the child were also concerning. Juanita Jones testified that she supervised several of the visits. When both parents were present, they often argued and yelled at each other during the visitations. The mother was often very emotional during the visits. On different occasions, she had to be told by supervisors to stop videotaping and taking pictures of the child's private parts. She also had to be told more than once not to wipe the child's face with the same wipe she had used during a diaper change to wipe the child's bottom. During one visit when the father did not come to the scheduled visitation, the mother recorded herself cussing about the father not being at the visit. According to Jennifer Rivas, who supervised that visit and was told at trial to just use the first letter of the cuss words, the mother recorded herself several times saying, "F.U., scum bag, you S. bastard." The mother also said in the recording that she hated the father.

At trial, the mother denied or downplayed the allegations involving her past conduct. She also testified that she had fixed up the house and that it was immaculate at the time of her testimony. The mother's testimony regarding the condition of her house at the time of the hearing was corroborated by a counselor involved with the mother in the She's for Sure Program. The mother and other witnesses testified about the mother's participation in numerous services that were required by her family service plan and her compliance in taking the medications prescribed for her bipolar disorder while this case was pending.

Several witnesses testified that it would not be in the best interest of the child to be returned to the parents. The ad litem for the child recommended that both parents' parental rights be terminated. The child was placed with his paternal grandmother in Arkansas in December 2013. Both parents listed the paternal grandmother as their first choice for a relative placement. The Department conducted a home study, approved the placement with the paternal grandmother, and changed its goal for the child from family reunification to relative adoption. The conservatorship caseworker for this case testified that the child was doing very well in that placement. The father testified that the child was happy, taken care of, and in a good place with the paternal grandmother. Despite having listed the paternal grandmother as her first choice for a relative placement, the mother's testimony revealed that she vehemently disagreed that that was a good placement for her child.

*Endangering Conduct*

With respect to the second issue, we hold that there was clear and convincing evidence from which the trier of fact could reasonably have formed a firm belief that the mother engaged in conduct that endangered the physical or emotional well-being of the child. *See* FAM. § 161.001(1)(E). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the

7

child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re D.O.*, 338 S.W.3d 29, 33 (Tex. App.—Eastland 2011, no pet.). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied); *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). The offending conduct does not need to be directed at the child, nor does the child actually have to suffer an injury. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Domestic violence may constitute evidence of endangerment. *Id.*; *C.J.O.*, 325 S.W.3d at 265.

In this case, there was evidence that both the mother and the father committed domestic violence against each other. Officer Almonte testified that the police had been involved in seventeen domestic-violence incidents involving the mother and father. The father had been convicted of assault family violence for an incident that occurred against the mother. There is evidence in the record indicating that, despite the mother's denials, she also had committed domestic violence against the child's father. The mother had been arrested twice for assault family violence, and one of those charges was still pending at the time of termination. At the time of the trial de novo, the mother was incarcerated for contempt of court. Despite the domestic violence, the mother and father continued their relationship and desired to be a family unit upon the return of the child to them. The mother did not believe that the father intended to harm her.

There was also evidence that the mother's mental instability had endangered the child and, if not properly medicated, would endanger the child in the future. The testimony of the labor and delivery nurse indicated that the mother's conduct at the hospital prior to the child's birth endangered the child.

8

We hold that the evidence is legally and factually sufficient to support the finding under Section 161.001(1)(E) because the mother engaged in a course of conduct that endangered the child's well-being. The mother's second issue is overruled. Because we find the evidence sufficient to support termination of the mother's parental rights under Section 161.001(1)(E), we need not address the mother's first, third, and fourth issues in which she challenges the sufficiency of the evidence to support termination under other subsections of Section 161.001(1) and under Section 161.003. *See* TEX. R. APP. P. 47.1.

*Best Interest*

We also hold that, based on the evidence presented at trial and the *Holley* factors, the trier of fact could reasonably have formed a firm belief or conviction that termination of the mother's parental rights would be in the best interest of the child. *See Holley*, 544 S.W.2d at 371–72. Upon considering the record as it relates to the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the parents and the proposed long-term placement, the plans for the child by the Department, the various states of the mother's home, the stability of the child's placement, acts and omissions indicating that the parent-child relationship was not a proper one, the domestic violence committed by the father against the mother, the mother's reaction to the father's violent acts, the domestic violence committed by the mother against the father, and the mother's mental instability, we hold that the evidence is sufficient to support the finding that termination of the mother's parental rights is in the best interest of R.R.V., II. *See id.* We cannot hold that the finding as to best interest is not supported by clear and convincing evidence. The mother's fifth issue is overruled.

*Permanent Managing Conservator*

In her sixth issue, the mother challenges the sufficiency of the evidence to support the trial court's appointment of the Department as the permanent managing conservator. The mother's argument under this issue is, however, based solely upon her contention that the evidence is insufficient to support the termination of her parental rights, arguments that she presented in her first five issues.

The findings necessary to appoint a nonparent as sole managing conservator need only be established by a preponderance of the evidence. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Consequently, we review a trial court's conservatorship decision under a less stringent standard of review than the standard for termination. *Id.* A conservatorship determination is subject to review for an abuse of discretion and may be reversed only if that determination was arbitrary and unreasonable. *Id.*

Although the Department was appointed as the permanent managing conservator, the record shows that the Department's ultimate goal for the child was adoption by a relative. The trial court ordered the child's paternal grandmother to report to the court every twelve months concerning the welfare of the child. Based upon the evidence presented at trial, we cannot hold that the trial court abused its discretion in appointing the Department as the child's permanent managing conservator. The mother's sixth issue is overruled.

*This Court's Ruling*

We affirm the trial court's order of termination.


February 10, 2015                                    JOHN M. BAILEY

Panel consists of: Wright, C.J.,                     JUSTICE
Willson, J., and Bailey, J.

10